IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| FRANKLIN DELANO SIMON, | ) | |
| AIS #170056, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CV-562-TMH |
| | ) | [WO] |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint, as amended, filed by Franklin Delano Simon ["Simon"], a state inmate, in which he challenges the medical treatment provided to him from September of 2007 until November of 2008 for degenerative spine disease, a knot on his neck, pain in his groin area, and injuries to his lower back and right leg suffered in June of 2008.[1]  Simon also complains the defendants refused to pay all costs associated with medical treatment provided to him by a free-world neurologist.  Simon names Correctional Medical Services, Inc. ["CMS"], the health care provider for the state prison system, Dr. Paul Corbier, Dr. Eugene Evans, nurse practitioner Domineek Guise, nurse practitioner Bradford Adams and physician assistant

---

[1]The claims before this court are contained in the amended complaint filed on August 19, 2008 (Court Doc. No. 11), and the amendments filed by the plaintiff on November 7, 2008 (Court Doc. No. 24) and November 14, 2008 (Court Doc. No. 31).

Donald McArthur, all employees of CMS, as defendants in this cause of action.  Simon requests that the court order the defendants to provide him proper medical treatment for his medical conditions.  *Plaintiff's Amended Complaint - Court Doc. No. 11* at 6.  He likewise seeks monetary damages from the defendants for the alleged violations of his constitutional rights.  *Plaintiff's Amendment to the Amended Complaint - Court Doc. No. 24* at 6.

The defendants filed a special report and relevant supporting evidentiary materials addressing Simon's claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to construe this report as a motion for summary judgment.  *Order of November 21, 2008 - Court Doc. No. 42*.  Thus, this case is now pending on the defendants' motion for summary judgment.  Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's response to the motion, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id.*  "'Shall' is also restored to express the direction to grant summary judgment." *Id.*  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of

material fact exists when the nonmoving party produces evidence that would allow a

reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters
> of professional judgment.  In respect to the latter, our inferences must
> accord deference to the views of prison authorities.  Unless a prisoner can
> point to sufficient evidence regarding such issues of judgment to allow him
> to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006)

(internal citation omitted).  Consequently, to survive the defendants' properly supported

motion for summary judgment, Simon is required to produce "sufficient [favorable]

evidence" which would be admissible at trial supporting his claims of constitutional

violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e),

*Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies]

is merely colorable ... or is not significantly probative ... summary judgment may be

granted." *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's

position will not suffice; there must be enough of a showing that the [trier of fact] could

reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505,

2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir.

1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to

create a genuine issue of material fact and, therefore, do not suffice to oppose a motion

for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275,

1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will

preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (Summary judgment is appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone

6

does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Simon fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment.  *Matsushita*, *supra*.

## III.  DISCUSSION

### A. Absolute Immunity

With respect to any claims Simon lodges against the defendants in their official capacities, they are entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity."  *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his [or her] official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900,  908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia*

7

*Department of Transportation*, 16 F.3d 1573, 1575 (11ᵗʰ Cir. 1994). Thus, the defendants are entitled to absolute immunity from those claims for monetary relief presented against them in their official capacities. *Parker v. Williams*, 862 F.2d 1471 (11ᵗʰ Cir. 1989).

## B.  Payment of Medical Expenses

Simon alleges the defendants refused to pay the entire balance of the medical expenses arising from his treatment at a free-world medical facility. *Plaintiff's November 7, 2008 Amendment to the Complaint - Court Doc. No. 24* at 2. Simon bases this claim on his receipt of a bill from the Brookwood Medical Center in Birmingham, Alabama. The defendants deny refusal of payment and maintain the "invoice from Brookwood Medical Center ... was inadvertently sent to Mr. Simon....  Any and all expenses arising from Mr. Simon's medical treatment and/or surgery during the time of this incarceration will be fully paid for by parties other than Mr. Simon.  Mr. Simon will not be responsible for any expenses and/or charges related to any medical care during the time of his incarceration with the Alabama Department of Corrections." *Defendants' Exhibit E (November 17, 2008 Affidavit of Larry Linton) - Court Doc. No. 41-5* at 2.  There is no evidence before the court to support Simon's conclusory allegation of non-payment and summary judgment is therefore due to be granted in favor of the defendants on this claim.

## C.  Deliberate Indifference to Medical Needs

On September 20, 2007, Simon reported to the health care unit at the Staton Correctional Facility "suffering from back and neck pain and a [large] knot ... that had grown on the back of his neck." *Plaintiff's Amended Complaint - Court Doc. No. 11* at

3.  Nurse practitioner Brad Adams examined Simon and observed a 3-4 centimeter "soft raised area to base ... of neck which is mobile & spherical; tender to palpation; according to patient, this has been present ... 5 or more years and is the source of his pain; area [appears to be a] lipoma.  Chart/medical records show this has been present since 2002." *Defendants' Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 41-1* at 52.  Adams observed "no obvious deformity" with movement of "chin to chest [with some] difficulty."  *Id*.  Adams ordered x-rays of Simon's cervical spine and neck, prescribed Percogesic for pain, advised Simon to apply moist heat as needed and provided a follow-up appointment for the following week.  *Id*.

On October 1, 2007, nurse practitioner Adams again examined Simon for "neck mass/pain" and to review the x-ray reports with Simon.  *Id*. at 51.  Adams referred Simon for approval of a magnetic resonance imaging ["MRI"] of his neck and spine.  *Id*.  Based on this referral, Dr. Corbier examined Simon on October 12, 2007 to evaluate his complaints of neck/upper back pain.  After thorough examination of Simon, Dr. Corbier determined that an MRI was not necessary at this time and advised Simon of this determination.  *Id*.  Dr. Corbier, however, ordered blood tests, recommended a treatment plan of pain management via medication and urged "re-evaluation in 2 months [or] sooner if need be."  *Id*.  Dr. Corbier prescribed Simon Percogisc, Motrin and Excedrine Migraine. *Id*. at 27.  On October 30, 2007, Simon reported to the health care unit to discuss the results of his tests and Dr. Corbier advised Simon that his "lab work ... was normal."  *Id*. at 50.  At this time, Simon made a complaint of testicular pain and advised he had suffered

this pain for "3-4 months since lifting weights (300-400 lbs)." *Id*. Upon examination, Dr. Corbier noted "[n]o enlargement of scrotum.   [No] hyrdocele [or] ... inguinal hernia...." *Id*. Dr. Corbier advised Simon to follow-up with him as scheduled.  Due to Simon's continued complaints of upper back and neck pain, Dr. Corbier ordered Simon to undergo an MRI of his cervical spine and neck.

On December 5, 2007, Integrated Magnetic Imaging of Montgomery, Alabama performed the ordered procedure.  The report attendant to the magnetic resonance image of Simon's cervical spine contains the following findings:

> There is straightening of the normal curvature.  There is no fracture or sublaxation.  There is mild disc space narrowing at C2-3, C4-5, and C6-7 with anterior and posterior spurring.  Spinal cord is normal course, caliber and signal.
> The disc at C2-3 is intact.  The neural foramina are patent.  The disc at  C3-4 shows a broad based posterior extrusion eccentric to the left with contact and deformation of the spinal cord and resultant spinal stenosis.  There is mild neural foraminal stenosis bilaterally.  The disc at C4-5 shows broad based right posterior extrusion with contact with the spinal cord with flattening of the cord and resultant spinal stenosis.  There is severe right neural foraminal stenosis.  The disc at C5-6 shows broad based posterior protrusion with a right posterior focal extrusion.  There is resultant spinal stenosis.  There is severe neural foraminal stenosis on the right.  The disc at C6-7 shows broad based extrusion with foci or prominent extrusion in the midline and to the left.  There is resultant spinal stenosis.  There is severe neural foraminal stenosis bilaterally.  The disc at C7-T1 is intact and the neural foramina are patent.  There is thickening of the posterior longitudinal ligament from C3 through C7.  Incidentally noted, there is a lobular fat containing lesion in the dorsal soft tissues at the C5-6 disc level to the T1-2 disc level.  This measures approximately 5.3x2.0x7.5cm most compatible with a lipoma.

*Defendants' Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 41-1* at 108.  The report on the magnetic resonance images of Simon's neck "[d]emonstrated

... a lobular fat containing lesion in the posterior lipomatous tissue of approximately C6 through T1....  This is compatible with a lipoma.  There is no evidence of abnormal enhancement or involvement of the underlying musclarture or bony structures."  *Id*. at 109.[3]

On December 14, 2007, Dr. Eugene Evans explained the results of the MRI to Simon, made a referral for Simon to receive a neurological consultation and provided him a follow-up appointment for December 28, 2007.  *Defendants' Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 41-1* at 49.  Simon prepared a sick call request on December 25, 2007 in which he complained of "a real bad cold."  *Id*. at 70.  Medical personnel prescribed various medications to Simon as treatment for his symptoms.  *Id*. at 26.  At this time, Simon did not make any complaints regarding pain in his neck or back.  *Id*. at 70.  Simon was a "no show" for his December 28, 2007 follow-up appointment with Dr. Evans regarding his back and neck pain.  *Id*. at 409.

Simon made no further complaints to medical personnel until April 6, 2008, at which time he filed a sick call request alleging exposure "to either lice or dust mites.... I

---

[3]Simon seeks to attribute various inculpatory statements to Dr. Evans and Dr. Francavilla regarding the results of the MRI. Neither the medical records submitted in this case nor the affidavit of Dr. Evans supports the alleged statements regarding the findings of the MRI which Simon seeks to attribute to Adams and Francavilla.  *Defendants Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 41-1* at 40 and 108-109; *Defendants' Exhibit C (Affidavit of Dr. Eugene Evans) - Court Doc. No. 41-3* at 1-4.  In addition, the court notes that the medical records, including copies of the MRI reports prepared by Dr. Paul Turner of Integrated Magnetic Imaging, a free-world facility, *Defendants Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 41-1* at 108-109, and the records of Dr. Francavilla, *id*. at 11, refute the statements Simon alleges Evans and Fracavilla made to him. The hearsay statements attributed by Simon to these doctors would not be admissible at trial.  Thus, in accordance with the directives of Rule 56 of the Federal Rules of Civil Procedure, this court cannot rely on such statements at the summary judgment stage.

don't have the crabs." *Id*. at 66.  On April 7, 2008, a nurse examined Simon for this complaint and noted "no broken areas ... on skin.  Hair checked, no bugs (lice), no bumps ...." *Id*. at 67.  The nurse prescribed hydrocortisone and a change in soaps.  *Id*.  Upon review of this entry into Simon's chart, nurse Adams advised Simon to "[t]ake meds as ordered" and follow-up with medical personnel as needed.  *Id*.

On April 29, 2008, Simon made his next complaint to medical personnel regarding neck and upper back pain.  *Id*. at 48.  Simon also complained of lower back pain and again referenced pain in his groin area.  *Id*.  Defendant McArthur examined Simon on this occasion.  Simon advised McArthur that "he took a 'break from [his] pain meds [due] to side effects of diarrhea." *Id*.  McArthur counseled Simon on the unilateral discontinuance of his medications and ascertained that Simon did "not wish to [re-]start meds." *Id*. McArthur also provided Simon with a medical profile approving him for a bottom bunk and limiting the amount of lifting he could do, *id*. at 19, and scheduled Simon an appointment with Dr. Corbier.  *Id*. at 48.  On May 2, 2008, Dr. Corbier examined Simon and reviewed the images produced by the MRI taken in December of 2007.  Dr. Corbier noted Simon suffered from degenerative "disc [disease] and may not be a surgical candidate [at this time due to zero] focal weakness." *Id*. at 47.  Dr. Corbier devised a treatment plan of continued monitoring of Simon's condition and pain management through the use of medications.  *Id*.  Dr. Corbier advised Simon to return for a follow-up appointment with him "in 3 weeks for further management." *Id*.

On May 23, 2008, Dr. Corbier again examined Simon regarding the inmate's

chronic neck and upper back pain caused by his degenerative disc disease.  *Id.* at 46.
Simon did not mention groin pain at this time.  *Id.*  Dr. Corbier prescribed medication to
alleviate Simon's pain and referred him for a follow-up appointment in six weeks.  On
June 9, 2008, defendant McArthur examined Simon for complaints of pain and tightness
in his lower back which Simon attributed to an injury suffered while lifting objects on
June 6, 2008.  *Id.*  McArthur "discussed stretches" as possible therapy for Simon, *id.* at
46, and prescribed Robaxin, Motrin and an analgesic balm to alleviate his pain.  *Id.* at 24.
On June 20, 2008, medical personnel renewed Simon's prescriptions for Robaxin and
Motrin.  *Id.*

On July 3, 2008, nurse practitioner Chappell reviewed Simon's sick call request in
which Simon complained of lower back and right leg pain resulting from the June 6, 2008
injury.  *Id.* at 45.  Simon "[a]lso [complained of] neck pain which is a chronic problem."
*Id.*  Chappell ordered Simon to the health care unit for examination by Dr. Corbier.  In
accordance with Dr. Corbier's orders, nurse practitioner Chappell continued Simon's
medical profile for no heavy lifting, issued an additional profile for no prolonged standing,
referred Simon for a neurological consultation, and issued Simon prescriptions for
Robaxin, Ultram and Tylenol.  *Id.* at 18 and 23.  On July 28, 2008, nurse practitioner
Chappell issued Simon a bottom bunk profile.  *Id.* at 22.

Health care personnel examined Simon on August 11, 2008 and August 26, 2008
regarding complaints of upper back and neck pain.  They determined his current treatment
plan should be continued pending his neurological consultation.  *Id.* at 45.  On September

13

18, 2008, Simon was transported to the office of Dr. Thomas Francavilla, a free-world neurosurgeon, for examination and evaluation.   Upon examination of Simon, Dr. Francavilla noted "no apparent distress.  [Simon] has a full range of motion which is painful at the extremes of his range of motion.  He has good muscle bulk, strength and tone in the upper extremities although his triceps seem slightly weakened compared to the remainder of his musculature.  Reflexes are 2+ at the biceps, triceps and brachioradialis.  Appreciation of light touch and pinprick is normal and symmetric.  Hoffman sign negative.  No ataxia on ambulation." *Id*. at 12.  Dr. Francavilla's assessment indicated "advanced stenosis at C6-7 with central herniation and bilateral foraminal stenosis.  There is a herniated disc at the C3-4 to the right.  It is probably asymptomatic." *Id*. at 11.  Based on this assessment, Dr. Francavilla advised Simon of  two potential treatment options. "We discussed injection therapy and pain management. We also discussed the alternative of anterior cervical discectomy and allograft fusion at C6-7.  I explained that the C3-4 is probably asymptomatic but it may require a second [separate] procedure.  He understands the risks of non-relief of pain, neurologic deficit, infection, need for further procedures and any unforeseen complications of the procedure.  All of his questions were answered and he would like to forth with this plan." *Id*.  Thus, after examination of Simon and review of his medical records, including the December 5, 2007 MRI, Dr. Francavilla considered pain management a potential treatment option for Simon.

On September 30, 2008, Simon was "seen ... at team conference" by prison medical personnel. *Id*. at 40.  Simon advised the medical team "that he does not want

neurosurgery at this time. [Simon] has been offered Mobic, Tylenol & Ultram ... for his continued neck and arm pain. Patient is declining these medications." *Id.* The following day, Dr. Corbier reviewed Simon's actions and noted Simon "had 2nd thoughts about having neurosurgery (though he told the neurosurgeon that he wanted to proceed [with] the neck surgery). Moreover, [patient] is not taking his oral/analgesic meds because he states he is not tolerating them. (Mobic, Tylenol & Ultram). [Patient] states that he wanted to have more information about the risk vs. benefits of actually having the surgery [and needs to confer with his mother before making a decision. Dr. Corbier instituted a plan to] follow-up [with Simon] for his final decision [regarding surgery]." *Id.* at 41-42. On October 2, 2008, Dr. Corbier held a consultation with Simon at which time Simon contemplated "whether to cancel surgery appt. based on his mother's suggestion. In final analysis, [Simon] opted to think for himself and decided he wants to proceed [with] neck surgery." *Id.* at 42.

On October 6, 2008, correctional officials transported Simon to Brookwood Medical Center in Birmingham, Alabama for surgical fusion of his C6-7 disc performed by Dr. Francavilla. *Id.* at 9 ("Anterior osteophytes removed and then a discectomy performed. Epidural space showed no significant compression and foraminotomies were performed after removal of the ligament. Prosthetic allograft was sent into the disk space under slight distraction and then a Medtronic plate was chosen and screwed to intervertebral bodies at C6 and C7 under fluoroscopic guidance and locking mechanism was ensured. After copious irrigation and meticulous hemostasis, the incision closed in

15

layers with Vicryl suture and Dermabond.  Tolerated without incident.")  Upon his return to the correctional facility later this same day, medical personnel monitored Simon's vital signs and examined the surgery site.  *Id*. at 42.

On October 21, 2008, Simon returned to Dr. Francavilla's office and John Denney, a certified physician's assistant, performed a post-operative examination of the C6-7 fusion.  *Id*. at 10.  This examination revealed "good strength and sensation in [Simon's] upper extremities ... [with] quite limited range of motion. His incision is healing nicely." *Id*.  The treatment recommendation consisted of "continued ... restricted activity ... physical therapy for his neck, ... a muscle relaxer and anti-inflammatory....."  *Id*.  Prison medical personnel reviewed the aforementioned recommendation and acted in accordance with the  treatment directives.  Simon attended a physical therapy session at Rehab Associates on October 29, 2008.  *Id*. at 43.  Dr. Corbier also arranged for Simon to receive physical therapy at the prison health care unit.  Finally, regarding his complaints of lower back pain, both an x-ray and an MRI were performed on plaintiff's lower back in the latter part of 2008..

Simon complains the defendants acted with deliberate indifference to a serious medical need by failing to provide him cervical surgery upon receipt of the results of the MRI in December of 2007.  He also alleges the defendants failed to provide him appropriate treatment for the pain in his groin which he believes emanated from a hernia. Simon further complains the defendants did not adequately treat his lower back pain and right leg injury attendant to an incident which occurred on June 6, 2008.  The defendants

16

adamantly deny they acted with deliberate indifference to Simon's medical conditions. The defendants further maintain they undertook an appropriate course of treatment for Simon's neck/upper back pain, properly evaluated and treated his groin pain, which could not be traced to a hernia, and provided appropriate treatment for his lower back pain and leg injury.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he

must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291; *Mandel*, 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants' response to the need was more than "merely accidental inadequacy, negligence in

diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

In addition to the above described requisite elements, when an inmate's deliberate indifference claim relates to a delay in treatment, this court must also consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007). In a case alleging that delay in medical treatment shows deliberate indifference, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Regional*

*Youth Detention Center*, 40 F.3d 1176, 1187-1188 (11th Cir. 1994), *overruled in part on other grounds*, *Hope v. Pelzer*, 536 U.S. 730, 739 n.9, 122 S.Ct. 2508, 2515 n.9 (2002).

The affidavits filed by the individual defendants address the allegations made by Simon. A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with the treatment provided to Simon. Dr. Corbier delineates the relevant treatment as follows:

> Mr. Simon was first seen at the Health Care Unit ("HCU") at Staton regarding complaints of neck pain on September 20, 2007. He was seen by a nurse practitioner, Brad Adams. Mr. Simon complained of ongoing neck pain that he had been having for approximately three weeks....
>
> I personally saw Mr. Simon for the first time on October 12, 2007. I examined Mr. Simon, specifically the mass on his neck. I also discussed with Mr. Simon his complaints of neck pain. After my evaluation of Mr. Simon, I concluded, at that time, that an MRI was not immediately necessary. However, I made a notation to follow up with Mr. Simon due to his complaints of neck pain.
>
> I next saw and examined Mr. Simon on October 30, 2007, for medical issues unrelated to Mr. Simon's complaints of [upper back and] neck pain. Mr. Simon was complaining of testicular pain, and was treated according [to my assessment of his condition]. Mr. Simon showed no indications of having a hernia at that juncture. However, he was examined thoroughly for his complaints. It was noted in Mr. Simon's medical file that Mr. Simon did have continued complaints of neck pain and headaches.
>
> An MRI was ordered for Mr. Simon, and [the MRI] was taken on December 5, 2007. The MRI showed multi-level degenerative disc disease and spondylosis, disc protrusions and extrusions, resultant spinal and neural foraminal stenosis. The MRI also revealed there to be a lipoma [or benign mass of fatty tissue] in the upper dorsal soft tissue.
>
> Mr. Simon was seen by Dr. Eugene Evans on December 14, 2007. Dr. Evans went over the results of the MRI with Mr. Simon.
>
> A follow-up appointment was made for Mr. Simon to be seen by Dr. Evans on December 28, 2007. However, Mr. Simon did not show up for the [December 28, 2007] appointment....

Mr. Simon was seen in the Sick Call on December 25, 2007. However, Mr. Simon's complaints at that time were only for a common cold, and Mr. Simon gave no complaints of back pain, neck pain or headache on December 25, 2007.

Mr. Simon [made no additional complaints of upper back/neck pain for several months and] was not seen again in the Health Care Unit [for any reason] until April 8, 2008. At that time, he had complaints of itching (pruritis).

Mr. Simon was not seen again in the Health Care Unit for any complaints of neck [or upper back] pain until April 29, 2008. At that time he was seen by physician assistant, McArthur. Subsequent to Mr. Simon's complaints of neck [and upper back] pain on April 29, 2008, he was given [medical] profiles of a bottom bunk, and no lifting greater than 15 pounds for ninety days. An appointment was made by McArthur for Mr. Simon to see me [on May 2, 2008].

[Prior to this appointment,] I reviewed the MRI taken of Mr. Simon on December 5, 2007, and in fact saw Mr. Simon on May 2, 2008. Mr. Simon was again noted to have spondylosis and degenerative joint disease. However, I noted at that juncture, Mr. Simon was not an immediate candidate for surgery due to the fact that there was no focal weakness. I noted that Mr. Simon was continuing to be monitored, and he was prescribed a steroid, Prednisone, for a possible inflammation of his discs. I noted that Mr. Simon was to be seen with a follow-up visit in three weeks.

I next saw Mr. Simon on May 23, 2008, and performed a physical examination on Mr. Simon. He was again noted for chronic neck pain, and was given a prescription for renewed medications. I noted in the file that Mr. Simon was to be followed-up with in six weeks.

Mr. Simon was next seen on June 9, 2008, by physician's assistant, McArthur. At this juncture, Mr. Simon was complaining of lower back pain, but no neck pain, that he received after lifting a heavy object [on June 6, 2008].

Mr. Simon continued to be seen and monitored at the Health Care Unit through June and July of 2008, and continued on ... profiles [limiting his physical activities] and medications.

On July 3, 2008, Simon was seen by me at the Health Care Unit.

Mr. Simon was thereafter seen by neurosurgeon, Thomas L. Francavilla, on September 18, 2008.

On September 30, 2008, I personally met with Mr. Simon, with physician's assistant, McArthur, and other medical professionals, to discuss Mr. Simon's medical condition with him.

I again saw Mr. Simon on October 1, 2008.  At that time, Mr. Simon informed me that he did not want to go through with the surgery.  However, when presented with a refusal of treatment form, Mr. Simon refused to sign the documentation.   It was noted that Mr. Simon was not taking his prescribed medications.   I had a long discussion with Mr. Simon with regards to the recommended surgery by Dr. Francavilla.   Mr. Simon informed me that he would discuss the proposed surgery with his mother.

I again saw Mr. Simon on October 3, 2008.  Mr. Simon, at that time, informed me that he had decided to go forward with the surgery.

Mr. Simon was again seen by Dr. Francavilla at the Brookwood Medical Center in Birmingham, on October 6, 2008, where Mr. Simon underwent an interior cervical discectomy, allographic fusion, and interior instrumentation.   The prescriptions ordered by the neurosurgeon, post surgery, have been made available to Simon at the correctional facility.

I next saw Mr. Simon on October 21, 2008.   [At this time], Mr. Simon informed me that he had ongoing complaints of low back pain. However, the decision was made to allow Mr. Simon to undergo rehabilitation and continue to follow him for any post-surgery issues and/or back pain. An x-ray has been ordered for Simon's lower back and the x-ray will be reviewed prior to making a determination as to whether an MRI is necessary. Physical therapy and rehabilitation was made available to Simon at the correctional facility post surgery.

Certain profiles, including a soft pillow profile, were written for Simon post surgery.....

Mr. Simon has never at any time been refused treatment and/or care. Each and every time Mr. Simon has sought medical care he has been seen and treated [in accordance with the attending medical professional's assessment of his conditions].....

I have thoroughly reviewed and I am familiar with the complete medical file pertaining to the care and treatment of Mr. Simon during his incarceration with the Alabama Department of Corrections.

It is my professional opinion, based on my review of the medical records pertaining to Mr. Simon's care and treatment, and my medical education, training, and experience, that Mr. Simon is, and has, received medical care and treatment within the standard of care for physicians practicing ... medicine in the State of Alabama.

*Defendants' Exhibit A (November 10, 2008 Affidavit of Dr. Paul Corbier) - Court Doc.*

*No. 41-1* at 2-7.

Dr. Evans advises he "only personally saw Mr. Simon on one occasion at the Staton Correctional Facility ... on December 14, 2007" at which time he discussed the results of the December 5, 2007 MRI with the patient. *Defendants' Exhibit C to the November 21, 2008 Special Report (November 12, 2008 Affidavit of Dr. Eugene Evans) - Court Doc. No. 41-3* at 2. Although Dr. Evans referred Simon for a neurological consultation, Dr. Corbier, upon an independent review of the MRI and examination of Simon, determined such referral was not necessary at this time and, instead, undertook a treatment plan of pain management via provision of various medications and issuance of medical profiles which limited Simon's physical activities.

In addressing the claims raised by Simon, defendant Adams, in pertinent part, stated that:

> I personally saw Mr. Simon at the Healthcare Unit ("HCU") at the Staton Correctional Facility regarding his complaints of neck pain on September 20, 2007. Mr. Simon complained of ongoing neck pain that he had been having for approximately three weeks.... On that date I ordered a cervical spine x-ray and a soft tissue neck x-ray. I also wrote a prescription for Percogesic for pain and wrote a follow up appointment for Mr. Simon for September 28, 2007.
>
> On October 1, 2007, I completed paperwork for Mr. Simon to have an MRI of the neck. Simon was written a prescription [for] Motrin on that occasion. An appointment was made for Mr. Simon for a follow-up appointment.
>
> On October 5, 2007, an appointment was made for Mr. Simon to followup with Dr. Corbier at the next available appointment time. Mr. Simon was in fact seen by Dr. Corbier on October 12, 2007.
>
> On October 22, 2007 Mr. Simon made a request to be given multiple profiles, including lower bunk and limited lifting. An appointment had been made for Simon to be seen on December 12, [2007]. However, I informed Simon through the HCU that he was to be seen at the next available appointment. [Simon was in the HCU on November 30, 2007 and

examined by Dr. Corbier.  He was again examined by medical personnel on
November 13, 2007 regarding his profile request.]

       On November 13, 2007, I made a request for an MRI of the cervical
spine and the soft tissues of the neck.  [This MRI was performed on
December 5, 2007].
***

       To my knowledge I have not personally seen Mr. Simon since
September 20, 2008.

*Defendants' Exhibit B (November 21, 2008 Affidavit of Bradford E. Adams) - Court Doc.*

*No. 41-2* at 2-3.

In addressing the complaint, defendant Guice  maintains she first "saw Mr. Simon

as a patient ... on September 28, 2008, when Mr. Simon returned to the correctional

facility from an outside consultation with a neurosurgeon.  At no time did I ever see, treat,

or evaluate Mr. Simon between July 2007, and September 2008."  *Defendants' Exhibit F*

*(Affidavit of Domineek Guice) - Court Doc. No. 41-6* at 2.  In addition, defendant

McArthur states:

       I saw Mr. Simon for the first time ... on April 29, 2008.  Mr. Simon's
blood pressure was checked at that time.  Due to Mr. Simon's complaints
of back pain, I prescribed him certain limited profiles, including a bottom
bunk profile for 90 days, and no lifting greater than 15 pounds for 90 days.
I also made a recommendation that Mr. Simon ... see Dr. Corbier at his next
available appointment.

       Mr. Simon was in fact seen by Dr. Corbier on May 2, 2008.  Dr.
Corbier again saw Mr. Simon on May 23, 2008.

       I personally next saw Mr. Simon on June 9, 2008.  At that juncture,
Mr. Simon was complaining of lower back pain, but no neck pain, [from an
injury] that he received after moving a heavy object [on June 6, 2008].

       Mr. Simon continued to be seen and treated by various medical
personnel at the Staton Correctional Facility Healthcare Unit through June
and July 2008.

       I next saw Mr. Simon on August 11, 2008.  At that time, a
neurosurgical consultation was recommended and submitted on behalf of

Mr. Simon.

Mr. Simon was again seen by me on August 26, 2008 where the neurosurgical consultation was reviewed and Prilosec was prescribed. [The neurological consultation was scheduled for October 6, 2008 with Dr. Thomas Francavilla.]

I next saw Mr. Simon on September 30, 2008, with Dr. Corbier and other medical professionals to discuss Mr. Simon's treatment and possible surgery.

Mr. Simon was again seen by me on October 1, 2008, at which time he refused all offered medications and informed me that he was refusing further neurosurgical care and treatment. A release of responsibility was filled out and Mr. Simon refused to sign it. Elmore Officer Corbitt witnessed and signed the form. Dr. Corbier was informed of Mr. Simon's actions.

At no time did I, nor anyone to my knowledge, ever refuse to see, treat, or care for Mr. Simon during the time of his incarceration. Each time that Mr. Simon sought medical care and attention he was seen and treated accordingly. Mr. Simon's medications have always been carefully prescribed and monitored. At all times, to my knowledge [and in my opinion], Mr. Simon has received appropriate medical care for his medical issues.

*Defendants' Exhibit D (November 21, 2008 Affidavit of Donald Francis McArthur) -*

*Court Doc. No. 41-4* at 2-3.

Initially, the court notes that Simon presents no verifiable medical evidence which indicates that his degenerative disc disease materially worsened from the time of the cervical spine MRI on December 5, 2007 until the performance of surgery on October 6, 2008; rather, the only evidence before the court, including the medical records of Dr. Francavilla, demonstrate that Simon's condition remained virtually the same during this period of time. Although Simon alleges his condition could have deteriorated to the point of paralyzation had he fallen or been hit in the back, *Plaintiff's Response - Court Doc. No. 53-1* at 10, this allegation fails to meet the requisite burden of proof as it is not verifiable

medical evidence and, by its very terms, does not establish that his condition actually worsened.  In addition, the medical records establish that the delay in referring Simon for surgery occurred due to the acknowledged serious nature of the surgical procedure involved -- possible death during the procedure, the non-life threatening nature of the condition, the availability of a viable alternative treatment plan, i.e., pain management through the prescription of medications and issuance of appropriate medical profiles limiting Simon's physical activities, and the initial determination that Simon did not represent an appropriate candidate for surgery as he suffered no focal weakness. *Defendants' Exhibit A (Medical Records of Franklin Delano Simon) - Court Doc. No. 1* at 1-116.

The medical records likewise establish that correctional medical personnel examined Simon in relation to each medical issue presented to them by the inmate, evaluated his physical condition at the time of the asserted complaint, prescribed pain medication to alleviate his discomfort, ordered necessary diagnostic tests to aid in their formulation of an appropriate treatment plan and engaged in a conservative treatment plan to manage the pain associated with his complaints.  Thus, Simon received medical treatment in the form of physical examinations, medical evaluations, pain medication and the issuance of various special needs profiles, including assignment to a bottom bunk and limitations on lifting, standing, pushing and pulling.  At the time Simon's physical condition warranted neurological intervention, correctional medical personnel referred him to an outside physician for evaluation and treatment.

Under the circumstances of this case, it is clear that the course of treatment undertaken by the defendants did not violate Simon's constitutional rights. The medical care Simon received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Although Simon alleges he should have received surgery on his back sooner than October 6, 2008 and also challenges the diagnoses and treatment decisions rendered by medical personnel with respect to his groin pain and the injuries suffered on June 6, 2008, these assertions, without more, fail to establish deliberate indifference. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional ... forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Simon received medical treatment for each of his asserted complaints and that the defendants rendered treatment to Simon in accordance with their professional judgment. Based on well settled law cited herein, Simon's mere desire for different modes of medical treatment does not amount to deliberate indifference. In addition, Simon has failed to present any evidence which indicates the defendants knew

the manner in which they treated his conditions created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Simon's medical conditions.  Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before February 11, 2011 the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

28

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 28th day of January, 2011.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE